[No. 12574.   Department Two.   March 31, 1915.]

THE STATE OF WASHINGTON, *Respondent*, v.
HENRY RUSSELL, *Appellant*.[1]

EMBEZZLEMENT — MISAPPROPRIATION BY AGENT — DEFENSES.   Upon
conviction of an agent of larceny by embezzlement under Rem. &
Bal. Code, § 2601, upon evidence of the accused that he was intrusted
with money to make a payment upon the purchase of a farm, with
the express agreement that he was to have no compensation for his
services, and that he paid only part of the money, appropriating the
balance to his own use, the accused can claim no defense under Rem.
& Bal. Code, § 2602, providing that "it shall not be larceny for any
bailee, factor, pledgee, servant, attorney or agent . . . to retain
his reasonable collection fee or charges;" the reasonable value of his
services being wholly immaterial.

SAME—DEFENSES—INSTRUCTIONS.   In such a case, an instruction
is as favorable to the accused as his own evidence warranted, where
the jury were told that it is a sufficient defense that the money was
withheld or appropriated openly and avowedly, under a claim of
right, proffered in good faith, honestly believing that he was legally
entitled to it as his own.

Appeal from a judgment of the superior court for Stevens
county, Blake, J., entered March 6, 1914, upon a trial and
conviction of larceny.   Affirmed.

*Jesseph & Bourland*, for appellant.

*John B. Slater* and *J. A. Rochford*, for respondent.

ELLIS, J.—The defendant was tried for the crime of lar-
ceny as defined by Rem. & Bal. Code, § 2601 (P. C. 135
§ 695), upon an information charging:

"That on or about the 15th day of March, 1912, in the
county of Stevens and state of Washington, the said de-
fendant, Henry Russell, then and there being, and then and
there having in his possession, and in his custody, and under
his control, as agent, and trustee, for Margaret Theobald
and A. Theobald, the sum of seven hundred and ninety-five
dollars, in money and property of the said Margaret and A.
Theobald, did then and there, with intent to deprive and de-

[1]Reported in 147 Pac. 194.

fraud the owners thereof, unlawfully and feloniously convert, withhold, and appropriate to his own use, the said sum of seven hundred ninety-five dollars, the same being lawful money of the United States of America and of the value of seven hundred and ninety-five dollars, contrary to the statutes in such case made and provided, and against the peace and dignity of the state of Washington."

The evidence presents no conflict. One Bresnahan owned a tract of land containing about two hundred acres near Colville, Stevens county, Washington, which he desired to sell for $22,000. One Hoy owned an adjoining tract. The prosecuting witnesses, Theobald and wife, were Hoy's brother-in-law and sister. They formerly owned and resided on a farm near Iowa City, in the state of Iowa. Hoy, hoping that they might be induced to purchase the Bresnahan land, had some conversation concerning it with Bresnahan, who told Hoy that if he could effect a sale, Bresnahan would be willing to pay him a commission of $500. No writing to that effect was ever made.

In the summer of 1911, Hoy became acquainted with the defendant, who so far as his business was disclosed, was an itinerant broker in mining stocks. In the fall of 1911, Hoy and his wife went on a visit to Iowa. For some unexplained reason, the defendant accompanied them, and on their arrival at Iowa City, went with Hoy to the Theobald farm and were introduced to the Theobalds. There is some evidence that, while on this journey, Hoy told the defendant that, if he would assist him in selling the Bresnahan land, they would divide the $500 commission. Theobald informed Hoy that he had sold his Iowa farm and contemplated moving to Texas. The family were averse to this, and Hoy sought to dissuade him, urging him to come to this state and buy the Bresnahan land, which he described to the Theobalds, either then or subsequently showing them photographs of the buildings. Finally, the Theobalds became interested and requested Hoy to negotiate the purchase of the land for them on his return

to Colville. This responsibility Hoy declined, advising that they make no purchase until they had visited Washington and examined the land. Hoy testified that, at this juncture, the defendant entered the conversation, saying:

" 'I will do the business.' Mrs. Theobald says, 'If you do the business out there for us we will not pay you any commission, I want that understood.' He said, 'It shall not cost you a cent of commission. I will do that for you to get you out to Washington. That is what we want. We want your kind of people in Washington instead of some other people that we know.' "

Both Theobald and wife testified to this conversation in substantially the same words, and the defendant himself made no denial of this version of the transaction. He admitted that he never had any agreement or understanding with anybody for compensation, for expenses or commission. With this understanding, the Theobalds entrusted the defendant with $1,295 in drafts, which sum the defendant was to pay to Bresnahan on the purchase price of his land, which price Hoy had informed the Theobalds would be $22,000. There is no evidence that, up to this time, Bresnahan had ever talked with or even knew the defendant.

Late in December, 1911, the defendant returned to Colville and entered into a contract with Bresnahan for the purchase of the land for the Theobalds, but paid him only $500 on the purchase price. Bresnahan, subsequently learning that the defendant had received an additional $795 from the Theobalds to pay on the purchase price, asked the defendant for it. The defendant informed him that it was Theobald's money and that he intended to keep it until he learned whether Theobald would take the ranch or not; that, if he did not, he, the defendant, would purchase it himself. Hoy, Bresnahan and Theobald's son all testified to this conversation, and the defendant admitted its substance. On February 7, 1912, the defendant wrote to Theobald as follows:

20—84 WASH.

"I have not [now] arranged to extend the contract to March 15th instead of March 1st, and Mr. Bresnahan puts deed, abstract and bills of sale for the personal property in the First National Bank. I have paid Mr. Bresnahan $500 and will pay him the balance when he completes his part of the contract, except $500, which he has promised to Mr. Hoy as commission. . . . You will understand that you have full credit on the purchase of this farm for $1,295."

In February or March, 1912, the exact date does not appear, the Theobalds came to Colville, and then learned that they had received credit for only $500 on the purchase price. The old contract for the purchase of the land was withdrawn from the bank and destroyed. Negotiations were reopened directly between Bresnahan and the Theobalds and finally a new contract on different terms was entered into and the Theobalds were placed in possession of the land. Meanwhile the defendant had disappeared. An information was filed against him, but he was not apprehended until September, 1913, when he was arrested at North Yakima. The trial resulted in a verdict of guilty as charged. From the judgment of conviction and sentence, he prosecutes this appeal.

It is claimed that the court erred, (1) in excluding evidence offered to show the reasonable value of services of real estate agents for negotiating sales of land; (2) in refusing to give a requested instruction to the effect that it is not larceny for an agent to retain his compensation from moneys entrusted to him by the principal, and that if the jury found that the appellant retained for his own use from the money entrusted to him by the Theobalds a sum for compensation for services rendered and that the sum retained was no more than a reasonable charge for such services, then the appellant was not guilty of larceny and the verdict must be in his favor.

These claims are directed to the same contention, namely, that the appellant was entitled to a commission, either from the Theobalds or from Bresnahan for bringing them together and negotiating the sale. This contention is wholly

lacking in evidential support.  There was no evidence whatever that either of the Theobalds or Bresnahan ever at any time promised to pay the defendant any commission or compensation of any kind, much less that any such promise was made in writing so as to constitute an enforcible contract under the statute of frauds.  On the contrary, the express agreement with the Theobalds was that he was to receive no compensation.  The appellant's own testimony negatives his present claim.  He testified that he received in all $1,295 from the Theobalds "to be used in the purchase of this land;" that he paid $500 to Bresnahan as a first payment on the purchase, and further, we quote from his own abstract:

"The $795 was to be paid to John Bresnahan on the contract.  I never had any arrangement with the Theobalds that I was to receive from them any compensation for expenses or commission.  I did not have any arrangement or understanding with anybody about it.  I don't know whether I talked commission or compensation with Mr. Bresnahan or not at the time we made this contract."

And again:

"I paid Mr. Bresnahan that certificate of deposit for $500 on the contract.  I had some conversation with Mr. Bresnahan afterwards near the First National Bank.  He said he had learned I had some money I had not turned over to him, and I ought to pay to him.  He said it was his money and insisted upon that.  I didn't tell him I was claiming that money as compensation for my services in the disposition of the place.  I told him I should retain that money until the contract was ratified and carried out on the part of the Theobalds.  I don't remember that I ever told him that I was claiming compensation for any commission.  I never was notified that the contract had been carried out.  Nobody ever made a demand upon me for the money. . . . I was working for Mr. Bresnahan in the sale of this land.  I finally retained this money for my expenses and my services in the making of the sale of this property."

This is the gist of the appellant's testimony.

The appellant bases his whole defense on the provisions of Rem. & Bal. Code, § 2602 (P. C. 135 §697), which reads as follows:

"It shall be no defense to a prosecution for larceny that the accused was entitled to a commission out of the money or property appropriated, as compensation for collecting or receiving the same for or on behalf of the owner thereof, or that the money or property appropriated was partly the property of another and partly the property of the accused; but that it shall not be larceny for any bailee, factor, pledgee, servant, attorney, agent, employee, or trustee, executor, administrator, guardian, officer or other person to retain his reasonable collection fee or charges."

Even assuming the fact, which the evidence not only fails to establish but clearly negatives, namely, that the appellant had a valid claim against Bresnahan for producing a purchaser of his land, the evidence presents no defense under the above quoted statute. The money was entrusted to the appellant by the Theobalds, as he himself admits, for a specific purpose, with the express understanding that he was to receive no compensation for his services. He did not collect this money for the Theobalds nor was he entitled to any collection fees or charges by reason of its coming into his possession. He did not collect it for Bresnahan. At the time he received it, he had never had any conversation with Bresnahan. At that time, the Theobalds owed Bresnahan nothing. The money was paid to him for the express and only purpose of making payment on the purchase price of the land in case such purchase could be negotiated. Even if he had had an enforcible contract with Bresnahan for a commission he would have had no claim on this money until it had been paid to Bresnahan or had been credited on the purchase price of the land. Until then it was, as he admitted, Theobald's money. The one dominant fact is undisputed. The appellant received this money from the Theobalds for a specific purpose and appropriated it to his own use. This, under the provisions of Rem. & Bal. Code, § 2601 (P. C.

135 § 695), constitutes larceny. What was the reasonable value of his services was a matter wholly immaterial in view of his own testimony. The offered evidence was properly excluded.

For the same reason, his requested instruction was properly refused. There is no predicate for such an instruction in the evidence. The court instructed the jury as follows:

"The laws of the state of Washington provide that in any prosecution for larceny it shall be a sufficient defense that the property was appropriated openly and avowedly under a claim of title preferred in good faith, even though the claim is untenable. Therefore, if you find from the evidence that the defendant withheld or appropriated to his own use the property or money described in the information and that he did so openly and avowedly under a claim of title preferred in good faith, that is honestly, believing that he was legally entitled to it as his own, then your verdict should be not guilty."

This instruction was fully as favorable to the appellant as his own testimony warranted.

A review of the many authorities cited would be of no profit, since the undisputed evidence brings the appellant's conduct directly within the plain terms of the statutory definition of larceny and offers no palliation or excuse.

The judgment is affirmed.

MORRIS, C. J., CROW, MAIN, and FULLERTON, JJ., concur.